## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**ROSA ZUBIA, et al.,**

        **Plaintiffs,**

**vs.**                                                                 **Civ. No.  14-0380 JH/GBW**

**DENVER CITY, a political
subdivision of the State of
Texas, et al.,**

        **Defendants.**


## <u>MEMORANDUM OPINION AND ORDER</u>

This matter is before the Court on the *Amended Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6) by Defendants Denver City, Texas, Jack Miller and Ryan Taylor* [Doc. 48]. In the motion, the moving defendants argue that under the Texas Tort Claims Act, they are immune from Plaintiffs' claims; that the Denver City Police Department ("DCPD") cannot be sued because it lacks separate jural existence; that Defendant Ryan Taylor ("Taylor") is entitled to qualified immunity; and that Plaintiffs' *Second Amended Complaint* [Doc. 42] fails to allege sufficient facts to state constitutional claims against defendants Denver City and Jack Miller ("Miller"). After reviewing the facts alleged in the amended complaint and the relevant law, as well as the motion, response, and reply briefs, the Court concludes that the motion to dismiss should be granted in part and denied in part as explained herein.

## <u>LEGAL STANDARD</u>

The Denver City Defendants move to dismiss Plaintiffs' claims under § 1983 on the grounds that they fail to state a claim. "To survive a motion to dismiss [under Rule 12(b)(6)], a

complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[W]e assume the factual allegations are true and ask whether it is plausible that the plaintiff is entitled to relief." *Gallagher v. Shelton*, 587 F.3d 1063, 1068 (10th Cir. 2009). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Further, in ruling on the motion to dismiss, the Court considers only the allegations in the pleadings.

Defendants also move to dismiss Plaintiffs' state tort claims on the grounds that Defendants are immune to those claims, thereby leaving this court without subject matter jurisdiction over them. A motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) may take two forms: facial attack or factual attack. When reviewing a facial attack on a complaint, the Court accepts the allegations of the complaint as true. By contrast, when reviewing a factual attack on a complaint, the Court "may not presume the truthfulness of the complaint's factual allegations." *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995). With a factual attack, the moving party challenges the facts upon which subject-matter jurisdiction depends. The Court therefore must make its own findings of fact. In order to make its findings regarding disputed jurisdictional facts, the Court "has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing." *Id*. The Court's reliance on "evidence outside the pleadings" to make findings concerning purely jurisdictional facts does not convert a motion to dismiss pursuant to Rule 12(b)(1) into a motion for summary judgment pursuant to Rule 56. However, in this instance the Defendants have not presented evidence

outside the pleadings in order to challenge the jurisdictional facts. Rather, Defendants are making a facial attack, compelling the Court to accept the allegations of the complaint as true.

## RELEVANT FACTS ALLEGED IN THE SECOND AMENDED COMPLAINT[1]

Plaintiffs are residents of Yoakum County, Texas, and their decedent, Amy Reyna, was a resident of Hobbs, New Mexico. Second Amended Complaint ("SAC") at ¶ 1. Denver City, which operates the Denver City Police Department, is a municipality and a political subdivision of the State of Texas. *Id*. at ¶ 2. Jack Miller is the Chief of Police of the DCPD. *Id*. at ¶ 4. Ryan Taylor is an Officer of the DCPD. *Id*. at ¶ 5. Miller and Taylor are residents of Denver City, Texas. *Id*. at ¶ 6.

On the afternoon of Sunday, October 27, 2013, three law enforcement officers met at the Stripes convenience store in Denver City, Texas. *Id*. at ¶ 32. They were Ryan Taylor of the DCPD, along with Kelly Williamson and Shawn Bradley, both of the Yoakum County Sheriff's Department. *Id*. Taylor informed Williamson and Bradley that there was an arrest warrant for Reyna for her failure to comply with the terms of her probation, and that she had been seen around town. *Id*. at ¶ 34. Reyna had not committed a violent crime, nor was there any indication that she was about to commit any crime. *Id*. at ¶ 35. Approximately ten minutes after this meeting, Taylor radioed that he had spotted Reyna and informed all units that he was in pursuit of a dark green Nissan Altima. *Id*. at ¶ 36. Taylor pursued the Altima, and shortly thereafter the driver pulled over, got out of the car, and surrendered to Bradley. *Id*. at ¶ 37. Reyna, who apparently had been a passenger in the Altima, then got into the Altima's driver's seat and fled on F.M. 1757 toward New Mexico. *Id*. at ¶ 38. Taylor and Williamson pursued her, along with

---

[1] In their respective briefs, the parties have asserted additional facts not pled in the SAC. Because this is a motion to dismiss under Rule 12(b)(6), the Court will not consider these additional unplead allegations but will rely solely upon the allegations contained in the SAC.

DCPD Chief Jack Miller. *Id*. Using his radio, Taylor informed law enforcement in Lea County, New Mexico, of the pursuit that was moving in their direction. *Id*. at ¶ 39. As a result, deputies from the Lea County Sheriff's Department ("LCSD") were dispatched toward the state line. *Id*. at ¶ 40.

Reyna entered New Mexico on Highway 133, traveling at speeds over 80 mph. *Id*. at ¶ 41. At that point, deputies from LCSD joined in the pursuit, *id*., though they did not instruct the Texas law enforcement agencies to cease pursing Reyna. *Id*. at 43.  In an attempt to stop Reyna, LCSD placed spike strips across Highway 133. However, Reyna avoided the strips and turned onto Highway 132 heading south. *Id*. at ¶ 44.  Shortly after passing mile marker 10, Reyna lost control of the Altima, went through a barbed wire fence, and entered an open field. *Id*. at ¶ 46. All four of Reyna's tires went flat, and her vehicle became disabled. *Id*. at ¶ 46. LCSD Deputy Andy Dominguez parked his patrol unit a few yards behind the Altima, while Williamson parked his unit on the right rear passenger side of the Altima. *Id*. at ¶ 48.

Taylor parked his unit on the driver's side of the Altima "and without hesitation got out of his unit, drew his duty weapon, walked right up to the front of Reyna's vehicle and fired three rounds into the hood of the vehicle and four rounds into Reyna. Amy Reyna was killed instantly." *Id*. at ¶ 49. There was no indication that Reyna had a weapon, and officers found no weapon in the Altima. *Id*. at ¶ 50.

Plaintiffs assert several causes of action against Denver City, Miller, and Taylor. In Count I, a *Monell* claim for municipal liability against Denver City[2], they allege that the

---

[2] The Denver City Defendants argue that the Denver City Police Department is a mere department of Denver City with no separate legal existence apart from Denver City itself. *See* Doc. 48 at 19. Plaintiffs cite no authority to the contrary and instead ask for discovery on the issue. However, the Court agrees with Defendants that police departments typically have no jural

violation of Reyna's rights was perpetrated pursuant to the custom and policy of the DCPD. Plaintiffs allege that the DCPD either maintains official policies of directing, encouraging, or permitting their deputies to engage in the use of excessive force or, in the alternative, maintains a de facto policy of ignoring such actions by its deputies. *Id*. at ¶ 55-59. In Count II, another *Monell* claim, Plaintiffs allege that the Denver City failed to adequately train or supervise its deputies, and that such failure was a "moving force" behind its deputies' illegal acts. *Id*. at ¶ 62, 68-70. Count III, another *Monell* claim asserting a failure to train and supervise by DCPD, appears duplicative of Count II in terms of its factual allegations. However, its title suggests that Count III is directed at Miller as Chief of the Denver City Police Department.

In Count IV, Plaintiffs assert a claim of wrongful death against Miller, asserting that he negligently caused the death of Amy Reyna by failing to properly supervise Taylor. *Id*. at ¶ 79-83. In Count V, Plaintiffs assert a claim of "assault, battery, and wrongful death" against Taylor, asserting that Taylor assaulted, battered, and killed Reyna "as she sat there in her vehicle, unarmed, and in no way attempting to injure any of the officers." *Id*. at ¶ 85-86. Plaintiffs allege that Taylor's acts were alternately negligent, or willful, intentional, or with wanton and reckless disregard of Reyna's rights and safety. *Id*. at ¶ 87.

In Count XIII, a claim of negligence or gross negligence, Plaintiffs allege that the Defendants owed and breached a duty of care to the public and to the Plaintiffs to properly execute an arrest warrant and to apply only the force reasonably necessary to do so. *Id*. at ¶ 102-04. They further allege that Defendants' negligence or gross negligence caused the death of Amy Reyna. *Id*. at ¶ 106.

---

existence apart from the city or county of which they are a department. Accordingly, the Court will construe all claims against the DCPD as claims against Denver City.

Finally, in Count IX(A), Plaintiffs allege that Taylor is liable under 42 U.S.C. § 1983 for the wrongful death of Amy Reyna based on his willful, intentional, and unreasonable use of deadly force against her. *Id*. at ¶ 114-116. In Count IX(B), Plaintiffs make a § 1983 claim against Miller and Denver City. With regard to Miller, Plaintiffs again allege that the excessive force used against Reyna "was done pursuant to [] Miller's and his agency's customs, policies, and practices . . ." in violation of the Fourth and Fourteenth Amendments. *Id*. at ¶ 117. Plaintiffs further allege:

> The force used against Amy Reyna was done by implicit and explicit authority granted by the governing body of Denver City, Texas, to Defendant Miller, in its contractual agreement for law enforcement services; therefore, Defendant Miller was also acting as an agent for Denver City for purposes of 42 U.S.C. § 1983.

*Id*. at ¶ 118.

In Count X, Plaintiffs request damages for loss of consortium. *Id*. at ¶ 131-133.

## PROCEDURAL HISTORY

Plaintiffs filed their original Complaint on April 24, 2014 and their First Amended Complaint on May 9, 2014. [Docs. 1, 3] On August 11, 2014, Plaintiffs filed their Second Amended Complaint [Doc. 42], which was followed by motions to dismiss by all Defendants. On March 30, 2015, this Court entered a Memorandum Opinion and Order granting the Yoakum County Defendants' motion to dismiss. [Doc. 75]. On November 30, 2015, the Lea County Defendants and Plaintiffs entered a stipulated dismissal of all claims against the Lea County Defendants, which this Court granted on December 3, 2015. [Docs. 80, 81, 82]. Thus, only the claims against Denver City, Miller, and Taylor remain pending.

**DISCUSSION**

**I.      WRONGFUL DEATH AND NEGLIGENCE (Counts IV, V, and VIII)**

The Court interprets Plaintiffs' claims for wrongful death in Counts IV and V as tort claims brought under state law, as distinguished from the federal constitutional claims asserted in Counts IX(A) and (B).  Plaintiffs' claim of negligence in Count VIII also sounds in common law tort. Defendants argue that under principles of comity, the Court should apply the Texas Tort Claim Act and find that Miller and Taylor are immune from these claims.

Analysis of these issues begins with the choice of laws. Here, Texas municipal defendants are being sued for actions involving the high speed chase of a New Mexico resident that began in Texas and concluded in New Mexico with the death of the fugitive.  The Court must determine what state's law controls the Plaintiffs' common law tort claims for negligence and wrongful death.

Generally, "[a] federal court sitting in diversity applies the substantive law, including choice of law rules, of the forum state." *Barrett v. Tallon*, 30 F.3d 1296, 1300 (10th Cir. 1994). However, this Court has federal question jurisdiction over Plaintiffs' constitutional claims brought under 42 U.S.C. § 1983, and *supplemental* jurisdiction, not diversity jurisdiction, over their common law tort claims. The Tenth Circuit has stated that the rule set forth in *Barrett* "also applies when a federal court exercises supplemental jurisdiction over state law claims in a federal question lawsuit." *BancOklahoma Mortg. Corp. v. Capital Title Co.*, 194 F.3d 1089, 1103 (10th Cir. 1999). Thus, the Court turns to New Mexico's choice of law rules to determine what substantive law applies to Plaintiffs' tort claims.

Where, as here, the underlying claim is categorized as a tort, "New Mexico courts follow the doctrine of *lex loci delicti commissi*—that is, the substantive rights of the parties are

governed by the law of the place where the wrong occurred." *Terrazas v. Garland & Loman, Inc.,* 140 N.M. 293, 296, 2006-NMCA-111 (Ct. App. 2006). The *lex loci delicti* rule defines the state where the wrong occurred as "the state where the last event necessary to make an actor liable for an alleged tort takes place." *Swindle v. General Motors Acceptance Corp.*, 101 N.M. 126, 128, 679 P.2d 268 (Ct. App. 1984). *See* Restatement (First) of Conflicts of Law § 377 & cmt. a (1934). Where the elements of the underlying claim include harm, the place of the wrong is the place where the harm occurred. *Torres v. State*, 119 N.M. 609, 613, 894 P.2d 386, 390 (1995) (observing that the place of the wrong is the location of the last act necessary to complete the injury); First Restatement, *supra*, at § 377 n. 1 (observing that in determining the place of the wrong, "[t]he question is only where did the force impinge upon [the plaintiff's] body"). Applying the foregoing law to the facts of this case as alleged in the SAC, the Court concludes that the last act necessary to complete the injury to Reyna occurred when Taylor shot her. This is was the last event necessary to make any of the defendants liable for an alleged wrongful death or for negligence. Because Taylor shot Reyna in New Mexico, choice of law rules suggest that the law of New Mexico applies to Plaintiffs' tort claims.

However, the Denver City defendants argue that they are subject not to New Mexico law, but to the Texas Tort Claims Act ("TTCA"), which does not waive sovereign immunity for Plaintiffs' intentional tort claims. *See* TEX. CIV. PRAC. REM. CODE § 101.021 (waiving sovereign immunity for the negligent operation or use of a motor vehicle or the negligent use of tangible personal property); *Harris County v. Cabazos*, 177 S.W.3d 105, 109 (Tex. App.—Houston [1st Dis.] 2005) (finding that Texas does not waive sovereign immunity for personal injury or death if such claim arises out of assault, battery, false imprisonment, or any other intentional tort, citing TEX. CIV. PRAC. REM. CODE § 101.057). Defendants reason that Denver City is a Texas

"governmental entity" while Miller and Taylor are Texas governmental employees, that Plaintiff Zubia and decedent Reyna are Texas residents, and that "under principles of comity, this Court should recognize the immunity granted under the Texas Tort Claims Act and apply Texas law." Doc. 48 at 5. This "comity," they contend, is "highly favored." Doc. 60 at 3. However, the Denver City Defendants cite no cases or other authority in support of their position that this Court should rely upon principles of comity to apply Texas law to their actions in New Mexico. On the other hand, the Court finds authority that suggests that it should not extend such comity when doing so would offend public policy embodied in New Mexico law.

The United States Supreme Court has held the doctrine that "no sovereign may be sued in its own courts without its consent" does not necessarily support a claim of immunity in another sovereign's courts. *Nevada v. Hall*, 440 U.S. 410, 416 (1979). For that reason, the Supreme Court found that California courts owed no obligation to enforce Nevada's claim to sovereign immunity against claims arising from a car accident in California, where California "has adopted as its policy full compensation in its courts for injuries on its highways resulting from the negligence of others, whether those others be residents or nonresidents, agents of the State, or private citizens." *Id*. at 426. Similarly, in this case New Mexico has a very different public policy view of sovereign immunity for the intentional actions of law enforcement officers. For reasons set forth in *Hicks v. State*, 88 N.M. 588, 544 P.2d 1153 (1975), the doctrine of sovereign immunity does not find favor in New Mexico common law and exists only where created by statute. The relevant statute here, the New Mexico Tort Claims Act, NMSA 1978, § 41-4-1 et seq., does not provide a police officer with sovereign immunity for claims for "personal injury, bodily injury, wrongful death or property damage resulting from assault, battery . . . or deprivation of any rights, privileges or immunities secured by the constitution and laws of the

United States or New Mexico when caused by law enforcement officers while acting within the scope of their duties." § 41-4-12. Thus, New Mexico has expressed a strong public policy against sovereign immunity for law enforcement officers who commit intentional torts such as assault and battery or constitutional torts such as the use of excessive force while acting within the scope of their duties. This stands in stark contrast to the Texas law that Defendants ask the Court to apply, which would grant the officers in question precisely the type of immunity that New Mexico has found to be improper. As a result, the Court believes that under the circumstances New Mexico courts would not utilize principles of comity to apply Texas law to Plaintiffs' claims.

And, in truth, this Court can see no reason why Defendants, who left the State of Texas, entered New Mexico, and allegedly committed torts in this State, could legitimately expect Texas law to apply to their actions. According to the allegations of the SAC, which the Court must accept as true at this stage, the Denver City Defendants pursued Reyna across state lines and, rather than handing the pursuit over to the Lea County Sheriff's Department (which was on the scene), continued their pursuit and then applied deadly force in a tortious manner. The Court does not agree with Defendants' characterization of this as a "dispute between Texas citizens and its governmental entities and employees." The events at issue may have begun as such, but when the parties entered New Mexico, Taylor employed deadly force in New Mexico, and torts were allegedly committed here, New Mexico's public policy concerns and New Mexico law gained primacy.

Thus, the TTCA does not apply. At the same time, the Court agrees with the Denver City Defendants that the New Mexico Tort Claims Act ("NMTCA") does not apply, either. By its express terms, the NMTCA applies only to the State of New Mexico and its agencies,

instrumentalities, local public bodies, and public employees. NMSA 1978, § 41-4-3(C) and (H). The Denver City Defendants being none of these, they can find no relief in the NMTCA. Thus, the Court concludes that New Mexico common law governs the Plaintiffs' tort claims against them. Accordingly, the motion to dismiss those claims based on sovereign immunity will be denied.

## II.     CLAIMS UNDER 42 U.S.C. § 1983

Title 42 U.S.C. § 1983 provides in part that "[e]very person who, under color of any statute, ordinance, [or] regulation . . . subjects . . . any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." *See also Camreta v. Greene*, 563 U.S. 692, 131 S.Ct. 2020, 2027, (2011) ("[Section 1983] authorizes suits against state officials for violations of constitutional rights."). "[T]o ensure that fear of liability will not unduly inhibit officials in the discharge of their duties, the officials may claim qualified immunity...." *Camreta*, 131 S.Ct. at 2030-31 (citation omitted) (quotations omitted). Qualified immunity applies only when government defendants are sued in their individual capacities. *Brown v. Montoya*, 662 F.3d 1152, 1164 (10th Cir. 2011). Under this principle, "government officials are not subject to damages liability for the performance of their discretionary functions when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Buckley v. Fitzsimmons*, 509 U.S. 259, 268 (1993) (quotations omitted). "Qualified immunity protects defendants not only from liability but also from suit." *Watson v. Univ. of Utah Med. Ctr.*, 75 F.3d 569, 577 (10th Cir. 1996).

Courts employ a two-part test to evaluate a qualified immunity defense. "In resolving a motion to dismiss based on qualified immunity, a court must consider [1] 'whether the facts that

a plaintiff has alleged make out a violation of a constitutional right,' and [2] 'whether the right at issue was clearly established at the time of defendant's alleged misconduct.'" *Leverington v. City of Colorado Springs*, 643 F.3d 719, 732 (10th Cir. 2011) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). The court has discretion to determine which prong to address first "in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236, 129 S.Ct. 808. The burden is on the plaintiff to prove both parts of this test. *See Dodds v. Richardson*, 614 F.3d 1185, 1191 (10th Cir. 2010). For the law to be clearly established "there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Morris v. Noe*, 672 F.3d 1185, 1196 (10th Cir. 2012) (quotation omitted). The plaintiff bears the burden to convince the court the law was clearly established. *Hilliard v. City & Cnty. of Denver*, 930 F.2d 1516, 1518 (10th Cir. 1991). "If the plaintiff fails to satisfy either part of this two-part inquiry, the court must grant the defendant qualified immunity." *Hesse v. Town of Jackson, Wyo.*, 541 F.3d 1240, 1244 (10th Cir. 2008) (quotations omitted).

### A.   Fourth Amendment Excessive Force Claim Against Taylor (Count IX(A))

#### 1.   *Law Regarding Excessive Force*

Claims of excessive force are analyzed under the objective reasonableness standard of the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 395-97 (1989). The reasonableness of the officer's belief as to the appropriate level of force should be judged from the perspective of an officer on the scene, rather than with the 20/20 vision of hindsight. *Id.* at 396. "Because police officers are often forced to make split second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation, the reasonableness of the officer's belief as to the appropriate level of force should be

judged from that on scene perspective." *Jiron v. City of Lakewood*, 392 F.3d 410, 414 (10th Cir. 2004) (quoting *Saucier v. Katz,*, 533 U.S. 194, 205 (2001)).

Courts must evaluate an excessive force claim by considering the totality of the circumstances. *Id*. Among the factors that courts should consider in determining whether a police officer applied excessive force are (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 396. Other factors to consider when assessing the degree of threat facing an officer include (1) whether the officer ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officer; (3) the distance separating the officer and the suspect; and (4) the manifest intentions of the suspect. *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008).

### 2. Analysis

Although Defendants likely disagree with the facts as alleged in the SAC, those are the only facts that are relevant on the motion to dismiss currently before the Court. According to the SAC, on October 27, 2013, Taylor met with deputies from Yoakum County Sheriff's Department to discuss a felony arrest warrant issued for Reyna for her failure to comply with terms of her probation. There was no indication that Reyna had committed or would commit a violent crime. Shortly thereafter, Taylor spotted Reyna and gave chase. The driver of the vehicle, a Nissan Altima, pulled over and surrendered, but Reyna got into the driver's seat and fled into New Mexico at speeds over 80 miles per hour. Taylor and Miller pursued her, joined by Deputy Kelly Williamson from the Yoakum County Sheriff's Department. After Taylor contacted them via radio, members of New Mexico's Lea County Sheriff's Department joined in the pursuit. After

Reyna entered New Mexico, the Lea County deputies placed spike strips on the highway, but Reyna avoided them. She lost control of the Altima, went through barbed wire fencing, and went into an open field. All four tires were slashed, and the car was stuck in the sand. After Reyna's car became disabled and the chase had ended, deputies from Lea and Yoakum Counties parked their vehicles behind and to the right of Reyna's car. Taylor parked his unit on the driver's side of the Altima "and *without hesitation* got out of his unit, drew his duty weapon, walked right up to the front of Reyna's vehicle and fired three rounds into the hood of the vehicle and four rounds into Reyna."  SAC at ¶ 49.  "There was no indication that Reyna had a weapon and no weapon was found in the vehicle." *Id*. at ¶ 50.

Taylor argues that he is entitled to qualified immunity on the excessive force claim because he did not violate Reyna's Fourth Amendment rights, and because Plaintiffs have failed to allege facts to support a violation of clearly established law. As to the former, Taylor argues that under *Tennessee v. Garner*, 471 U.S. 1, 11 (1985), "where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." According to Taylor, Plaintiffs have not alleged sufficient facts in the SAC to "enable this court to determine whether Officer Taylor did or did not have probable cause to believe Reyna posed a threat of serious physical harm." Doc. 48 at 9-10. The Court disagrees. Plaintiffs have alleged that Reyna was wanted on a warrant for failing to fulfill certain terms of her probation on a non-violent offense. Plaintiffs also alleged that Reyna's vehicle had come to a stop because it was stuck in the sand, all four tires were slashed, and the car was disabled. Plaintiffs have alleged that "there was no indication that Reyna had a weapon and no weapon was found in the vehicle." Further, Plaintiffs have alleged that upon arriving at the scene, "without hesitation"—i.e., without taking

any time to evaluate whether Reyna was going to continue to flee, resist arrest, or use force against the officers—Taylor got out of his car, drew his weapon, walked right up to the front of Reyna's vehicle and fired three rounds into the hood of the vehicle and four rounds into Reyna. The allegations are that Reyna was unarmed. Although the factual allegations in the SAC are not highly detailed, the Court concludes that at this stage they are enough to state a claim under Rule 12(b)(6) for excessive force. The Supreme Court said in *Tennessee v. Garner*, 471 U.S. 1, 11 (1985), that "[a] police officer may not seize an unarmed, nondangerous suspect by shooting him dead." In *Garner*, an unarmed suspected burglar was fleeing from police, despite verbal warnings to halt. *Id*. at 3-4. The officer shot him in an effort to prevent his escape. *Id*. at 4. The Court found that the officer's actions violated the Fourth Amendment:

> Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so. . . . A police officer may not seize an unarmed, nondangerous suspect by shooting him dead. . . . Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

*Id*. at 11-12.

Here, the facts alleged are that the chase of Reyna had come to an end. She was alone in a disabled vehicle in the middle of a field, surrounded by officers from three different law enforcement agencies. She was unarmed, and the officers had no reason to believe otherwise. She was not attempting to flee on foot, and Plaintiffs allege that before taking any time to evaluate the situation and without warning, Taylor simply shot her. The Court anticipates that Taylor disagrees with the facts surrounding the chase and subsequent shooting as alleged by

Plaintiffs. However, on this motion to dismiss, the Court must accept the facts as alleged by the Plaintiffs. And, on those facts, the Court concludes that Plaintiffs have plead a constitutional violation under *Garner*.

Next, Taylor argues that even if Plaintiffs have adequately alleged a constitutional violation, Taylor could not have known that his conduct violated clearly established law. To this end, Taylor cites *Plumhoff v. Rickard*, 134 S.Ct. 2012 (2014) and other cases from the Supreme Court involving high speed chases. However, none of these cases is applicable here because in each of these cases, the high speed chase was ongoing and the suspect continuing to flee (and thus present a danger to the public) at the time the officers used deadly force. The Court reasoned:

> Just before the shots were fired, when the front bumper of his car was flush with that of one of the police cruisers, Rickard was obviously pushing down on the accelerator because the car's wheels were spinning, and then Rickard threw the car into reverse "in an attempt to escape." Thus, the record conclusively disproves respondent's claim that the chase in the present case was already over when petitioners began shooting. Under the circumstances at the moment when the shots were fired, all that a reasonable police officer could have concluded was that Rickard was intent on resuming his flight and that, if he was allowed to do so, he would once again pose a deadly threat for others on the road.

*See Plumhoff*, 134 S.Ct. at 2021-22.

Here, the facts alleged in the SAC are very different. The chase had come to an end, the car was disabled, and there are not facts indicating that Reyna was continuing to attempt to flee, either by car or by foot. Similarly, there are no facts to support a contention that Reyna posed a danger to others by possessing a weapon; indeed, the allegations are to the contrary. Taylor did not warn Reyna before firing at her, instead firing "without hesitation." Under *Tennessee v. Garner*, 471 U.S. 1, 11 (1985), which was clearly established law at the time of these events, Taylor's use of force was excessive in violation of the Fourth Amendment.

Accordingly, the Court will deny Taylor's motion to dismiss the excessive force claim against Taylor.

### B.        Claims Against Miller (Counts III, IX(B))

In Count III, Plaintiffs allege that DCPD (and Miller as Chief of the DCPD, based on the heading of that count) failed to properly train and supervise unnamed officers "regarding the circumstances under which they could engage in the use of the [sic] force as it pertained to the apprehension of Amy Reyna or others in her situation." Doc. 42 at ¶ 74.  Plaintiffs allege that these acts and omissions were pursuant to the customs and policies of Denver City, and that Denver City (and therefore Miller) were "deliberately indifferent to the rights of Plaintiff and other citizens of Denver City, TX." *Id*. at ¶ 76. The SAC contains no factual allegations regarding the specific training that was lacking, or any facts that to support a claim of deliberate indifference. In Count IX(B), Plaintiffs repeat the allegation that the force used against Reyna was done pursuant to Denver City customs and policies, was excessive and in violation of the Fourth Amendment; and was done via the grant of authority from Denver City to Miller. *Id*. at ¶ 117-18.

The Tenth Circuit has held that "[i]ndividual liability under § 1983 must be based on personal involvement in the alleged constitutional violation." *Fogarty v. Gallegos*, 523 F.3d 1147, 1162 (10th Cir. 2008) (quoting *Foote v. Spiegel*, 118 F.3d 1416, 1423 (10th Cir. 1997)). In 2009, the Supreme Court made clear that there is no *respondeat superior* liability under § 1983: "Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). The Supreme Court explained: "In a § 1983 suit or a *Bivens* action – where masters do not answer for the torts of

17

their servants – the term 'supervisory liability' is a misnomer. Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Id*. at 677.

The Tenth Circuit further explained in *Dodds*, that "[w]hatever else can be said about *Iqbal*," at least one form of liability against defendant-supervisors survives:

> A plaintiff may therefore succeed in a § 1983 suit against a defendant supervisor by demonstrating: (1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation.

*Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010).

Here, the pleadings do little more than assert the mere conclusion that Miller failed to train and supervise Taylor, and that he acted with deliberate indifference to Reyna's rights. The SAC parrots the standards necessary for supervisory liability without providing enough facts to establish what the training was or should have been to avoid the alleged unconstitutional use of force. Indeed, Plaintiffs plead nothing regarding what specific skills Taylor needed to handle recurring situations for which Miller, his supervisor, failed to provide training. Nor does the SAC allege a pattern of past constitutional violations that would have given Miller notice that his failure to train or supervise was substantially certain to lead to constitutional violations. Plaintiffs' SAC alleges no more than legal conclusions against Miller in his individual capacity, and thus, the complaint fails to state a claim that plausibly gives rise to an entitlement to relief. *See Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). Plaintiffs' supervisory claims will therefore be dismissed. *Compare Sanchez v. Pereira-Castillo*, 590 F.3d 31, 49-50 (1st Cir. 2009) (concluding that complaint failed to show plausible entitlement to relief against supervisory defendants on

supervisory liability/failure to train claim based merely on allegations that defendants, with deliberate indifference, failed to ensure that officers under their command followed procedures to respect rights of plaintiff and that surgery resulted from strip search and x-ray policies), with *Davis v. City of Aurora*, 705 F.Supp.2d 1243, 1262-64(D. Colo. 2010) (refusing to grant supervisory defendants qualified immunity where complaint alleged significantly more facts about policy, specifically that supervisory defendants created or allowed creation of policy that required officers, upon report of suspected burglary, to unconstitutionally seize subject without objective criteria, which thus dictated seizure of burglary suspects with guns).

Accordingly, the claims against Miller will be dismissed without prejudice.

### C.      Claims Against Denver City (Counts I, II, and IX(B))

In Count I, Plaintiffs allege that the violation of their rights was "perpetrated pursuant to the custom and policy of the Denver City Police Department," Doc. 42 at ¶ 55, which "either maintain[s] official policies of directing, encouraging or permitting their officers to engage in the use of excessive force without supporting reasonable basis or, in the alternative, maintain[s] a *de facto* policy of ignoring such actions by Defendants and other law enforcement agents in their employ." *Id*. at ¶ 56. In Count II, Plaintiffs allege that Denver City's "failure to maintain policy/procedure and /or train its officer in the use of force in the pursuit/apprehension of a fleeing suspect was proximate cause of Amy Reyna's death." *Id*. at ¶ 64. In Count IX(B), Plaintiffs allege that the excessive force used against Reyna "was done by implicit and explicit authority granted by the governing body of Denver City." *Id*. at ¶ 118. Plaintiffs plead no facts to support these conclusory allegations.

"[A] plaintiff suing a county under section 1983 for the actions of one of its officers must demonstrate two elements: (1) a municipal employee committed a constitutional violation, and

(2) a municipal policy or custom was the moving force behind the constitutional deprivation." *Myers v. Okla. County Bd. of County Com'rs*, 151 F.3d 1313, 1318 (10th Cir. 1998). As a result, like supervisors sued in their personal capacities, municipalities cannot be held liable under 42 U.S.C. § 1983 on a *respondeat superior* theory for merely employing a tortfeasor. *Monell v. Dept. of Soc.Servs. of City of N.Y.*, 436 U.S. 658, 691 (1978). Municipalities, instead, are subject to § 1983 liability only when their official policies or customs cause a plaintiff's injuries. *Id.* at 691, 694; *Johnson v. Johnson*, 466 F.3d 1213, 1215 (10th Cir. 2006). Furthermore, when the official policy at issue is a failure to properly train a police officer, "in order for liability to attach to a municipality, the failure to train must amount to deliberate indifference to the rights of persons with whom the police come into contact." *Myers*, 151 F.3d at 1318 (quotation omitted). To state a claim against Denver City for either failure to supervise or failure to train, Plaintiff must show not only that Denver City employees acted with deliberate indifference, but that there was also a direct causal link between this underlying constitutional violation and an official custom or policy. *See Mee v. Ortega*, 967 F.2d 423, 431 (10th Cir. 1992) (quotation omitted) (failure to supervise); *Myers*, 151 F.3d at 1318 (quoting *City of Canton v. Harris*, 489 U.S. 378, 389 (1989)) (failure to train).

Plaintiffs' conclusory allegations do not sufficiently allege any acts or omissions by Denver City or Miller to state a claim for deliberate indifference, let alone any facts giving rise to an inference that such acts or omissions were the result of Denver City's training or supervision policies or a failure to implement such policies. For the same reasons that Plaintiffs' SAC fails to state a claim against Miller in his individual capacity, Plaintiffs fail to state a plausible claim for municipal liability. *See Martin v. Dist. of Columbia*, 720 F.Supp.2d 19, 23 (D.D.C. 2010) (granting city's motion to dismiss § 1983 claim based on inadequate training when allegations

did "nothing more than recite the required causal elements of custom or policy liability based on deliberate indifference" and plaintiff's "conclusory statements" were "unsupported by additional factual allegations"); *cf. Jordan by Jordan v. Jackson*, 15 F.3d 333, 340 (4th Cir. 1994) (holding that the complaint stated a claim against the county under § 1983 when it alleged existence of several specific customs or policies); *Anderson v. City of Blue Island*, No. 09C5158, 2010 WL 1710761, at *2 (N.D. Ill. April 28, 2010) (finding plaintiff's § 1983 claim survived city's motion to dismiss when plaintiff's allegations of inadequate training "highlight[ed] a specific deficiency in the training provided to [police officers] he encountered on the night in question and present[ed] a plausible causal connection between the training and constitutional deprivation he allegedly suffered.").

Plaintiffs argue that the discovery process may reveal relevant evidence regarding Denver City's customs and policies to support these claims. While the Court appreciates Plaintiffs' desire to better develop their claims through discovery, Rule 8 and *Iqbal* require that a complaint state such claims with sufficient particularity and in a manner calculated to provide fair notice to the defendants. Because Plaintiffs have failed to follow these standards with respect to their allegations in Counts I, II, and IX(B), those claims must be dismissed without prejudice as to the Denver City Defendants. *See Ashcroft v. Iqbal*, 556 U.S. 662, 680-81 (2009).

### D.   Other Constitutional Torts

In their SAC, Plaintiffs make fleeting reference to constitutional rights other than those enumerated in the Fourth Amendment which they claim the Denver City Defendants violated. These include the Fourteenth Amendment [SAC at ¶ 111], due process, equal protection, and the right to necessary medical treatment. SAC at ¶ 112. Defendants argue that the SAC fails to state a claim of violation of any of these constitutional rights; Plaintiffs do not respond to those

arguments. However, the Court notes that Plaintiffs have failed to allege that other similarly situated individuals were treated differently than Reyna, as required to state a claim for equal protection. *See Brown v. Montoya*, 662 F.3d 1152, 1172-73 (10th Cir. 2011). Similarly, with regard to the claim for due process, Plaintiffs have failed to explain how the facts as alleged in the SAC show that Taylor had sufficient time to actually deliberate and exhibited conscience-shocking deliberate indifference toward Reyna  as required in *Green v. Post*, 574 F.3d 1294, 1302 (10th Cir. 2009). Finally, Plaintiffs make reference to a claim for failure to provide medical care. Such a claim requires allegations of deliberate indifference to serious medical needs. *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006). However, Plaintiffs allege that Reyna was "killed instantly" after Taylor shot her. SAC at ¶ 49. Plaintiffs do not explain how Defendants could have provided Reyna with medical care in light of their allegation that she died immediately after having been shot.

Accordingly, the foregoing claims will be dismissed without prejudice.

## III.    ADDITIONAL GROUNDS FOR DISMISSAL OF CLAIMS

Finally , in its previous Memorandum Opinion and Order this Court held that, under the New Mexico wrongful death statute Plaintiff Rosa Zubia cannot recover for her own loss as Reyna's parent. That statute provides that a surviving parent cannot share in the proceeds of recovery for wrongful death unless the decedent has no surviving spouse or child. *See* NMSA 1978, § 41-2-3(D). However, the caption of the SAC indicates that Zubia has brought claims on behalf of herself and "the minor children, H.H., H.M., and H.L." Because Reyna appears to have surviving children, Zubia's claims will be dismissed with prejudice.

**IT IS THEREFORE ORDERED** that the *Amended Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6) by Defendants Denver City, Texas, Jack Miller and Ryan Taylor* [Doc. 48]is **GRANTED IN PART and DENIED IN PART** as explained herein**.**

**IT IS FURTHER ORDERED** that:

(1)      Plaintiffs' claims against Denver City and Jack Miller in Counts I, II, III, and IX(B) are hereby **DISMISSED WITHOUT PREJUDICE**;

(2)      Plaintiffs' claims for violation of her rights to equal protection, due process, and for failure to provide medical care are **DISMISSED WITHOUT PREJUDICE**; and

(3)      Plaintiff Rosa Zubia's wrongful death claims against the Denver City Defendants on her own behalf are **DISMISSED WITH PREJUDICE**.

_____

**UNITED STATES DISTRICT JUDGE**